**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

WILLIAM CATO SELLS                    )
                                                        )          3:06-CV-0023-LRH (VPC)
            Plaintiff,                              )
                                                        )
      vs.                                              )          **REPORT AND RECOMMENDATION**
                                                        )          **OF U.S. MAGISTRATE JUDGE**
E.K. MCDANIEL, *et al.*,                 )
                                                        )
            Defendants.                         )          August 20, 2008
_____)

      This Report and Recommendation is made to the Honorable Larry R. Hicks, United States

District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28

U.S.C. § 636(b)(1)(B) and LR IB 1-4.  Before the court is defendants' motion for summary

judgment (#114).  Plaintiff opposed (#134) and defendants replied (#136).  The court has

thoroughly reviewed the record and the motion and recommends that defendants' motion (#114)

be granted in part and denied in part.

**I. HISTORY & PROCEDURAL BACKGROUND**

      William Cato Sells ("plaintiff"), a *pro se* prisoner, currently is incarcerated by the Nevada

Department of Corrections ("NDOC") at Ely State Prison ("ESP") and is classified as "High Risk

Potential" ("HRP") (#1).  Plaintiff brings his complaint pursuant to 42 U.S.C. § 1983, alleging

that prison officials are violating his Fourteenth Amendment right to due process, his Eighth

Amendment right against cruel and unusual punishment, and his First Amendment right

prohibiting retaliation.  *Id*.  Plaintiff names as defendants Eldon K. McDaniel, ESP Warden; and

Jackie Crawford, former NDOC Director.[1]  *Id*.

      Plaintiff's complaint is based on a number of events occurring between 1998 and the

present.  In March 1998, while incarcerated at Southern Desert Correctional Center ("SDCC"),

_____

      [1] Plaintiff originally filed suit in the Seventh Judicial Court of the State of Nevada, in and for the
County of White Pine, on May 20, 2005 (#1).  On January 13, 2006, defendants removed to federal court
pursuant to 28 U.S.C. § 1441 (#2).

1    plaintiff was charged with possession of a "self-made" master key which could allegedly unlock

2    SDCC cell doors (#1, ¶ 11).  Plaintiff pled guilty, although he now denies his guilt.  *Id.* at ¶ 12.

3    In June 1998, two inmates informed prison officials that plaintiff had been manufacturing and

4    distributing cell door keys to SDCC inmates.  *Id.* at ¶ 13.  Plaintiff alleges that prison officials

5    threatened that if he did not cooperate with the investigation, they would not only make him look

6    like a snitch, but he would receive disciplinary detention such that "there will be no light at the

7    end of the tunnel."  *Id.* at ¶ 14.  Plaintiff did not cooperate, and received what he alleges is a

8    fabricated notice of charges ("NOC") for escape and possession of metal.  *Id.* at ¶ 15.  Allegedly,

9    during his disciplinary hearing, officials told plaintiff that if he did not plead guilty to the charges,

10   he would receive three to four years in disciplinary segregation; thus, plaintiff pled guilty and

11   received two six-month consecutive terms in disciplinary segregation.  *Id.* at ¶ 16.  On June 17,

12   1998, plaintiff was transferred to ESP to serve his sentence and was classified HRP upon arrival.

13   *Id.* at ¶ 18.  Plaintiff alleges that over the years, the classification committee has recommended

14   him for removal from HRP status, but that defendant McDaniel has consistently and unfairly

15   denied removal.  *Id.* at ¶¶ 19-21, 33-35.  Plaintiff further alleges that he has received numerous

16   false and fabricated NOCs, some of which accuse him of possessing bent paperclips that looked

17   like manufactured handcuff keys.  *Id.* at ¶¶ 22-24, 27-30.  Plaintiff claims that he has been told

18   that in order to be removed from HRP status, he must remain disciplinary-free for one year;

19   however, he states that this is impossible because prison officials issue false NOCs with the

20   purpose of keeping him classified as HRP.  *Id.* at ¶¶ 23.  With each NOC, plaintiff loses good

21   time credits, receives more time in disciplinary segregation, and gets farther away from being

22   removed from HRP status.  *Id.* at ¶¶ 25, 26, 29, 31. Plaintiff seeks declaratory relief, injunctive

23   relief removing him from HRP, general and special damages, and fees and costs.

24        The Court notes that the plaintiff is proceeding *pro se*.  "In civil rights cases where the

25   plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff

26   the benefit of any doubt."  *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th

27   Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

28   ///

## II. DISCUSSION & ANALYSIS

### A. Discussion

#### 1. Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual disputes exist. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994). In deciding whether to grant summary judgment, the court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996); Fed.R.Civ.P. 56(c). In inmate cases, the courts must

> [d]istinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 126 S.Ct. 2572, 2576 (2006). Where reasonable minds could differ on the material facts at issue, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson*, 477 U.S. at 248. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

///

///

///

**B. Analysis**

The court carefully reviewed all of the parties' evidence, and summarizes only the relevant portions.[2]  The evidence confirms that in June 1998, plaintiff was accused of and pled guilty to manufacturing, distributing and possessing over three dozen keys that unlocked various doors at SDCC (#134, Ex. 2).[3]  In a cell search, the prison found an un-mailed letter to the plaintiff's mother discussing escape from SDCC and admitting that he had "access to keys to every lock in this institution" (#34-11, p. 1).  Plaintiff received two 180-day terms in disciplinary segregation to be served consecutively, and on June 17, 1998, the plaintiff was transferred to ESP (#134, Ex. 2 and Ex. 4).  ESP officials classified plaintiff as HRP at that time because the prison found him to be an "escape risk."  *Id.*  Plaintiff has been classified HRP ever since.

**1. Eleventh Amendment Immunity**

Defendants argue that the Eleventh Amendment bars plaintiff from suing them in their official capacities (#114, p. 14).  The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit... against one of the United States by Citizens of another State... ."  U.S. Const. amend XI.  The Supreme Court has held that a suit against a state official in his or her official capacity is not suit against that official, but rather a suit against the official's office; therefore, an official acting in his or her official capacity is not a "person" under section 1983.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).  Since the state and its officials are not considered "persons" within the meaning of section 1983, "they cannot be held liable under the statute for money damages."  *Bank of Lake Tahoe v. Bank of America*, 318 F.3d 914, 918 (9th Cir. 2003).  However, when a state official is sued in his official capacity for prospective injunctive relief, he is considered a "person" for the purposes of section 1983.  *Doe v. Lawrence Livermore Nat. Laboratory*, 131 F.3d 836, 839 (9th Cir. 1997).

---

[2] In addition to the evidence submitted with the present motion cycle, the court reviewed previously submitted evidence.  *See* #s27, 31, 32(*sealed*), 33, 34(*sealed*), 36, 53, 75, 98, 103 and 126.

[3] Plaintiff has maintained since 1998 that he did not plead guilty to the manufacturing charge and that the officials made a mistake on his disciplinary form (#134, Ex. 4).  Plaintiff notes that no one can find his 1998 plea sheet and he therefore has no evidence of what he actually agreed to.

Plaintiff names defendants in their individual and official capacities, and he requests both money damages and a permanent injunction for removal from HRP segregation (#1). Plaintiff may sue defendants in their official capacities for prospective injunctive relief. However, the court grants summary judgment as to all claims seeking monetary damages against defendants in their official capacities.

## 2. Fourteenth Amendment Due Process Claim

Defendants argue that the plaintiff does not have a liberty interest in remaining free from HRP status, and that even if the court finds a liberty interest, he has received sufficient due process (#114, pp. 7-11). The procedural guarantees of the Fourteenth Amendment's Due Process Clause apply only when a constitutionally-protected liberty interest is at stake. *Tellis v. Godinez*, 5 F.3d 1314, 1316 (9th Cir. 1993). Evaluating due process claims requires a two-part inquiry: the court must first determine whether a liberty interest is implicated, and if so, the court then must ascertain what process is due. *Neal v. Shimoda*, 131 F.3d 818, 827 (9th Cir. 1997).

### a. Liberty Interest

Liberty interests can arise both under the Constitution and from state law. *Wolff v. McDonnell*, 418 U.S. 539, 557-58 (1974). The Constitution itself does not confer a liberty interest in avoiding transfer to more adverse conditions of confinement. *Wilkinson v. Austin*, 545 U.S. 209, 221-22 (2005). However, a prisoner's liberty interest in his conditions of confinement may be found based on state policies and regulations. *Id*. at 222. Those interests are:

> generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force... nonetheless impose[s] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citations omitted). There is no single standard to determine whether a prisoner's condition is an atypical and significant hardship; instead, "the condition or combination of conditions or factors... requires case by case, fact by fact consideration." *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) (citation omitted). The court looks to three "guideposts by which to frame the inquiry:"

> (1) whether the challenged condition "mirrored those conditions

5

1  imposed upon inmates in administrative segregation and protective
2  custody," and thus comported with the prison's discretionary
   authority; (2) the duration of the condition, and the degree of
3  restraint imposed; and (3) whether the state's action will invariably
   affect the duration of the prisoner's sentence.

4  *Id*.

5  ### (i) The Challenged Conditions

6  The court must first determine whether HRP segregation conditions mirror "those

7  conditions imposed upon inmates in administrative segregation and protective custody." Pursuant

8  to Institutional Procedure ("IP") 7.11, entitled "Segregation Unit Operations," disciplinary

9  detention ("DD") is "a form of separation from the general population in which inmates

10 committing serious violations ... are confined by the disciplinary committee" (#115, p. 1

11 (*sealed*)).[4] DD placement occurs only after an impartial hearing, and segregation is limited to

12 fifteen days or less in any thirty-day period. *Id*. Disciplinary segregation ("DS") is also a form

13 of separation from the general population, but is for "inmates who have committed general,

14 major, or work release violations." *Id*. at p. 2. Placement in DS is by disciplinary committee

15 action only and sentences are for "a definite period of confinement," although the duration can

16 range between one day to ninety-six months per incident. *Id*. Administrative segregation ("AS")

17 is for inmates who are a threat to life, property, staff, self, other inmates, or the security or orderly

18 running of the institution. *Id*. The length of confinement in AS "may be for relatively extensive

19 periods of time;" thus, AS inmates receive monthly custody reviews. *Id*. Finally, HRP inmates

20 are those who have exhibited assaultive behavior against staff or other inmates, have escaped or

21 attempted escape, or have been sentenced to death and are being transported outside of the prison.

22 *Id*.

23 DD, DS, AS and HRP share some characteristics. All segregated inmates have meals in

24

25 _____

   [4] As defendants filed IP 7.11 under seal, the court endeavors to set out only information necessary
26 to compare the different custody levels. Defendants additionally submit two documents – one entitled "HRP
   Status at Ely State Prison" which purports to compare HRP to other forms of segregation (#114, Ex. F), and
27 a chart comparing the privileges allowed each custody level (#114, Ex. H). Both documents lack
   identification of an author, a regulation number, and a date, and neither has been authenticated by affidavit.
28 The court does not rely on either document in making its determination.

their cells.  Each time an inmate is removed from his cell, he must submit to an unclothed body search and wrist and leg restraints – DD, DS, and AS inmates are always accompanied by two officers when out of their cells, but HRP inmates have further restrictions as outlined below.  All segregated inmates are permitted five hours of exercise per week and three showers per week for ten minutes at a time.  All segregated inmates are permitted legal phone calls.

DD inmates may possess no personal property except necessities such as a mattress, a pillow, sheets, soap, toothpaste, a toothbrush, and clothing.  They may possess only five legal books at a time, legal materials related to active litigation, and religious books.  All canteen items and personal phone calls are prohibited.  Finally, DD inmates may receive only legal and first-class mail and legal and religious visitors (from behind glass and with restraints in place).

DS inmates are permitted to possess all personal property except certain hot pots and lamps, hobby craft items, and sewing kits.  Personal clothing is limited, and prohibited canteen items include tobacco products, soda, jelly, mayonnaise, jalapeno sauce, squirt lotion bottles, an ash tray, a soap tray, and clip-on blue blocker sunglasses.  DS inmates retain all visiting privileges and may make one personal phone call per month.

AS inmates have the same personal property limits as DS inmates and also retain all visiting privileges.  However, AS canteen restrictions are slightly more lax in that they allow some tobacco products and soda.  AS inmates may make one personal phone call per week and they receive classification reviews every thirty days.

Death Row inmates are allowed daily exercise and tier time, during which they may shower (#45 (citing #36, 1st ROG responses, No. 9)).  They have less restrictive canteen privileges than segregated inmates and are permitted contact visits and one personal phone call per day.  *Id*.  Unlike segregated inmates, death row inmates are unrestrained when walking within their unit.  *Id*.

General population ("GP") inmates are permitted daily access to the main yard and tier, during which they may shower (#45 (citing #36, 1st ROG responses, No. 8)).  GP inmates eat in the culinary, may hold a prison job, and have access to the gym and chapel.  *Id*.  They are not escorted in restraints, are permitted visits three days per week, and get one personal phone call

1 | per day. *Id.*

2 |     In comparison, HRP inmates have a sign on their cell door in red letters that alerts staff

3 | that they are on HRP status. When HRP inmates are moved throughout the unit, they must be

4 | accompanied either by three regular officers or two Certified Emergency Response Team

5 | ("C.E.R.T.") officers plus a shift supervisor. They are attached to a "control lead," *i.e.*, a restraint

6 | leash, in addition to full restraints. HRP inmates may have visitors, but only behind glass and

7 | without any contact. HRP inmates may not exercise in adjoining yards at the same time and have

8 | less hours than other segregated inmates to access the yard. All food must be delivered by at least

9 | two officers, and each time an HRP inmates' food slot is opened for any reason, one officer must

10 | hold a Plexiglas shield over the opening. All officers in contact with HRP inmates must wear

11 | helmets with the face shield down at all times. C.E.R.T. officers conduct twice weekly random

12 | cell searches. HRP inmates may make one personal phone call per month. However, HRP

13 | inmates have the same personal property limits as DS and AS inmates, and have identical canteen

14 | restrictions to AS inmates.

15 |     In *Wilkinson*, the Court found a liberty interest in remaining free from Ohio's supermax

16 | facility based on certain restrictive conditions. *Wilkinson*, 545 U.S. at 223-24. Significant to the

17 | court's decision was that inmates were prohibited almost all human contact because they were

18 | confined to their cells for twenty-three hours per day, were fed there, and were not permitted

19 | conversation from cell to cell. *Id.* The light was on twenty-four hours per day, and exercise

20 | occurred for only one hour per day in an indoor room. *Id.* at 224. These conditions, combined

21 | with two additional significant conditions, created a liberty interest; the first was duration –

22 | classification in the supermax facility was indefinite. *Id.* The second was that the classification

23 | disqualified an otherwise eligible prisoner from parole consideration. *Id.*

24 |     It is clear from the evidence that HRP is one of the most restrictive classifications at the

25 | most secure prison in Nevada. Similar to *Wilkinson*, HRP inmates are afforded almost no human

26 | contact – in fact, there is no evidence that they are ever permitted human contact. HRP inmates

27 | must eat alone. All visits must be behind glass. HRP inmates receive only five hours of yard

28 | time per week during which they are entirely isolated because they may only exercise in yards not

1    adjacent to other inmates.

2           Defendants compare HRP to DD and DS and conclude that HRP is not an atypical and

3    significant hardship in comparison to the "ordinary" incidents of prison life.  This implies that

4    DD and DS are "ordinary" prison conditions.  The court disagrees.  Defendants also argue that

5    HRP is not the most restrictive classification  – that DD and DS are – and as such, there is no

6    liberty interest.  However, the inquiry is not whether the challenged conditions are the most

7    restrictive, but whether the challenged conditions "mirror" the conditions in administrative

8    segregation.  *See Keenan v. Hall*, 83 F.3d 1083, 1088 (9th Cir. 1996) (finding that *Sandin*

9    suggests that a major difference between the conditions for the general prison population and the

10   segregated population triggers a right to a hearing).  It is true that both DD and DS have stricter

11   property and canteen restrictions than HRP.  However, what is significant here, as it was in

12   *Wilkinson*, is the duration of time an inmate must endure such conditions.  DD lasts, *at the most*,

13   fifteen days at a time.  DS, which is approximately the same restriction level as HRP in terms of

14   property and canteen privileges, is "for a definite period of time," and inmates have the ability to

15   shorten their disciplinary sentence with good behavior.[5]  Further, although AS inmates are similar

16   to HRP inmates in that they do not have a definite re-classification date, AS inmates have

17   privileges that HRP inmates do not have – most significantly, AS inmates are permitted human

18   contact such as exercise time with a cell mate and contact visits, as well as more frequent personal

19   phone calls.  As the court explains in further detail below with respect to the process for HRP

20   removal, HRP is the only classification category in which it is possible for an inmate to be

21   isolated under extremely restrictive conditions, without any human contact, for his entire life.  It

22   is clear that HRP is much more restrictive than administrative segregation or general population

23   based on the above factors.  The court concludes that HRP meets the first *Sandin* guidepost.

24                              **(ii) Duration of Condition**

25           Concerning the second factor, the *Sandin* court found a thirty-day sentence in disciplinary

26

27   _____

28           [5] Although it theoretically is possible that some inmates are isolated in DS for ten years at a time,
     like plaintiff has been on HRP status, defendants have not made that claim nor presented evidence of it.

                                            9

1   segregation acceptable. *Sandin*, 515 U.S. at 486. However, the Ninth Circuit has held that two

2   years in disciplinary segregation is "most significant," and stated that "the length of confinement

3   cannot be ignored in deciding whether the confinement meets constitutional standards." *Ramirez*,

4   334 F.3d at 861. The *Wilkinson* court found that an indefinite term with annual reviews was

5   significant to finding a liberty interest. *Wilkinson*, 545 U.S. at 224. Here, plaintiff has been

6   indefinitely segregated as HRP, under severely restrictive conditions, *for just over ten years*.

7   There is no question that the duration of this classification, in addition to the level of restraint as

8   outlined above, clearly works "a major disruption" in plaintiff's prison environment. The second

9   *Sandin* guidepost is met.

10                     **(iii) Duration of Sentence**

11          Finally, the third *Sandin* guidepost concerns whether plaintiff's classification will affect

12   the duration of his sentence. Plaintiff claims that on December 21, 2001, Yolanda Morales, a

13   Nevada Parole Board member, told him that the board does not grant parole to HRP inmates

14   (#134, p. 15). Plaintiff argues that this effectively means that defendants have enhanced his

15   sentence of life with the possibility of parole to life without parole. *Id*. Defendants submit the

16   declaration of Connie Bisbee, a Parole Commissioner for the Nevada Board of Parole

17   Commissioners, who affirms that while the parole board does consider an inmate's custody level

18   in making a parole determination, it "is only one of many factors considered" and is "in no way

19   solely determinative of the Board's decision to grant or deny parole" (#114, Ex. C). As part of

20   the hearing, the Parole Board considers the inmate's entire criminal and social history and

21   conducts a "lengthy" interview with the inmate. *Id*. In 2004, the parole board denied plaintiff's

22   parole based on his "criminal and social history, along with his institutional adjustment," the

23   contributing factors being his eighteen prior felony convictions, his "habitual criminal"

24   conviction, and his "extremely poor disciplinary record." *Id*.

25          Ms. Bisbee also correctly notes that Ms. Morales did not participate in or vote at

26   plaintiff's 2004 parole board hearing. *Id*. However, plaintiff's claim is that Ms. Morales

27   informed him of the "no parole for HRP inmates" rule during his *2001* parole hearing. Plaintiff's

28   "Offender Information Summary" ("OIS") reveals that plaintiff did have a parole hearing on

                                                        10

1    December 21, 2001, and that Ms. Morales was present (#114, Ex. A, pp. 6-7).[6]

2        The court in *Wilkinson* found significant the fact that the Ohio regulations mandated

3    parole denial for prisoners in the Supermax facility.  That is not the case here.  The Court in

4    *Sandin* rejected the claim that the inmate's misconduct record would "inevitably affect" his

5    chances at parole because "nothing in Hawaii's code requires the parole board to deny parole in

6    the face of a misconduct record or to grant parole in its absence."  *Sandin*, 515 U.S. at 487.  The

7    *Sandin* court noted that the decision to release a prisoner was based on a "myriad of

8    considerations;" thus, the "chance that a finding of misconduct will alter the balance is simply too

9    attenuated to invoke the procedural guarantees of the Due Process Clause."  *Id*.  Similar to

10   *Sandin*, Ms. Bisbee's affidavit demonstrates that HRP status is only one factor in a Nevada parole

11   determination.  Yet, plaintiff's allegation is that Ms. Morales told him that the parole board does

12   not grant parole to HRP inmates.  There is no evidence before the court demonstrating that the

13   parole board has ever paroled an HRP inmate, and Ms. Bisbee's affidavit is silent on the matter.

14   Defendant McDaniel indicates that no records are kept on this issue (#27, RFA response 9).

15   Thus, it is unclear whether the parole board's consideration of HRP status effectively precludes

16   parole in practice.

17       Nevertheless, when the court views all three *Sandin* "guideposts" together, it concludes

18   that plaintiff has a liberty interest in remaining free from HRP status.  *See Kritenbrink v.*

19   *Crawford*, 457 F. Supp.2d 1139, 1149 (D.Nev. 2006) (holding that although it was not entirely

20   clear that the third *Sandin* factor was met, viewing all the facts together, the inmate had a liberty

21   interest in remaining free from being classified by NDOC as a sex offender); *see also Ramirez*,

22   334 F.3d at 861 ("the condition or combination of conditions or factors... requires case by case,

23   fact by fact consideration.").

24                              **b. Due Process Procedural Requirements**

25       A liberty interest having been found, the court now turns to what process is due.

26   _____

27       [6] Plaintiff's OIS purports to be a complete list of all prior felony convictions, history of movement
     within the NDOC system, history of disciplinary violations while in custody, and all custody status reviews
28   (#114, Ex. A).

                                            11

1    Defendants claim that plaintiff has received sufficient process over the years because he gets

2    monthly reviews and bi-yearly appearances before the full classification committee (#114, p. 11).

3    Plaintiff argues that defendants' initial and continued classification to HRP constitute an

4    enhanced punishment for the 1998 key incident at SDCC, and that he was never informed that

5    by pleading guilty to certain charges at SDCC, he would be exposed to indefinite HRP

6    segregation (#134).

7                              **(i) Constitutional Due Process Requirements**

8           The *Wilkinson* court held that three inquiries are relevant to determining what process is

9    due:

10                  First, the private interest that will be affected by the official action;
                    second, the risk of an erroneous deprivation of such interest
11                  through the procedures used, and the probable value, if any, of
                    additional or substitute procedural safeguards; and finally, the
12                  Government's interest, including the function involved and the
                    fiscal and administrative burdens that the additional or substitute
13                  procedural requirement would entail.

14   *Wilkinson*, 545 U.S. at 224-25 (citing *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976)).  As to

15   the first factor, the inmate's interest, "while more than minimal, must be evaluated, nonetheless,

16   within the context of the prison system and its attendant curtailment of liberties."  *Id*. at 225.

17   With respect to the second factor, notice of the factual basis for the classification review or

18   decision, and a fair opportunity for rebuttal are "among the most important procedural

19   mechanisms for purposes of avoiding erroneous deprivations." *Id*. at 225-26.  Finally, the Court

20   stated that the state's strong interest in prison security and the safety of its guards and personnel,

21   as well as the use of its scarce resources, must guide any due process determination.  *Id*. at 227-

22   28.

23          The *Wilkinson* court noted that where, as here, the "inquiry draws more on the experience

24   of prison administrators, and where the State's interest implicates the safety of other inmates and

25   prison personnel, the informal, nonadversary procedures set forth in *Greenholtz* ... and *Hewitt* ...

26   provide the appropriate model." *Id*. at 228-29 (citing *Greenholtz v. Inmates of Nebraska Penal*

27   *and Correctional Complex*, 99 S.Ct. 2100 (1979); *see also Hewitt v. Helms*, 459 U.S. 460

28   (1983)).   In both *Greenholtz* and *Hewitt*, the Court approved an informal, nonadversary

12

1   evidentiary review, with prior notice and an opportunity for the inmate to appear and present

2   statements, either in writing or orally, on his own behalf. *See Greenholtz*, 99 S.Ct. at 2107-08 and

3   *Hewitt*, 459 U.S. at 476. In *Greenholtz*, which involved parole issues, the court additionally noted

4   that if the board denied parole, the inmate was entitled to the reason for denial as a guide for

5   future behavior. *Id*. at 2108. Notably, the *Hewitt* Court warned that segregation "may not be used

6   as a pretext for indefinite confinement ... ." *Id*. at 477, n. 9.

7                              **(ii) NDOC Regulations**

8           Two documents appear to govern the procedures for HRP status at ESP – IP 4.34, entitled

9   "High Risk Potential Inmates" (#32, Ex. D), and IP 5.01, entitled "Duties of Institutional

10  Classification Committees" (#53, Ex. 5).[7]   IP 5.01 states that classification should be "an

11  objective process," guided by an inmate's institutional adjustment, nature of offense, criminal

12  history, and program considerations (#53, Ex. 5). Prior to initial classification, an inmate's name

13  must be submitted to the classification committee for review (#32, Ex. D) . An inmate "shall"

14  receive forty-eight hours notice prior to the initial meeting of the full classification committee.[8]

15  *Id*. Representatives from the mental health and medical departments are "to participate in the

16  initial classification hearing and interview the inmate" (#53, Ex. 5).

17          After the initial classification process, inmates must have twenty-four hours notice of

18  subsequent classification reviews. *Id*. IP 4.34 provides that the full classification committee

19  "should review H.R.P. inmates semi-annually or at the request of a member of the full

20  classification committee to determine if the H.R.P. designation should be removed" (#32, Ex. D).

21  The criteria for HRP removal are listed as follows:

22                •   The inmate must remain one year disciplinary free.

23                •   The inmate must present and maintain a positive attitude and
                     positive programming as demonstrated by participation in

24

---

25          [7] Interestingly, the term "High Risk Potential Segregation" was not contained in the Code of Penal

26  Discipline until August 2, 2004, more than six years after plaintiff was classified as such (#98-2, RFA
    response 1).

27
            [8] IP 5.01 requires that an inmate be initially classified within one business day of arriving at ESP;

28  thus, the two procedures seemingly conflict, unless the inmate receives notice prior to transfer to ESP.

1    available correspondence classes from the education department and/or the recreation department.

2

•   It is expected the inmate will demonstrate a cooperative attitude with unit staff and receive a positive recommendation from unit staff.

3

4

•   During the classification process, an inmate is expected to acknowledge responsibility for his behavior, which resulted in placement onto the HRP status.

5

6

•   The inmate must also request the removal of the HRP status in writing to the assigned unit caseworker.

7

8    (#53, Ex. 5, p. 7).  If the full classification committee recommends removal, "a memorandum is

9    to be prepared" and forwarded to the Warden.  *Id.*  The Warden then has sole discretion to make

10   a re-classification decision (#32, Ex. D).  An inmate may appeal the decision through the regular

11   grievance procedure.  *Id.*

12                    **(iii) Analysis**

13          The initial 1998 intake entry in plaintiff's OIS states, "[Plaintiff] will be placed in MLU

14   to serve DS & he will be placed also on HRP status due to being viewed as an escape risk" (#134,

15   Ex. 4).  The OIS indicates that thereafter, plaintiff received full classification committee hearings

16   approximately every six months, and also received nearly monthly AS reviews (#114, Ex. A).[9]

17   Almost all of the OIS entries state that plaintiff is classified HRP due to his knowledge of keys,

18   locks and locking devices.  *Id.*  Many entries state that he is an escape risk.  *Id.*

19          The evidence reveals that plaintiff was first recommended for removal in December 1998

20   by committee member Mark Drain, but this was denied (#134, Ex. 4).  On October 21, 2004,

21   plaintiff appeared before the full classification committee and was informed that the committee

22   would discuss plaintiff's possible removal from HRP with the Warden (#114, Ex. A).  The

23   January 11, 2005 monthly review entry states, "Was submitted for removal of HRP status last

24   month but have not yet received reply from the Warden."  *Id.*  On January 19, 2005, plaintiff

25

26   ───────────────

27          [9] Plaintiff's full classification committee hearings were held on December 9, 1999, June 1, 2000, December 7, 2000, June 7, 2001, December 13, 2001, June 5, 2002, October 17, 2002, April 17, 2003, October 24, 2003, May 20, 2004, October 21, 2004, June 23, 2005, January 20, 2006, August 11, 2006, March 1, 2007, and November 16, 2007 (#114, Ex. A).

28

1   requested verification from defendant McDaniel as to the status of his request, to which the

2   defendant replied:

3           You can file whatever you want.  But please understand that the
        classification committee can make recommendations but I decide
4           who is placed on HRP status and who is removed.  I will take the
        recommendation from staff and classification committee.  The
5           HRP status by policy and design is the Warden's approval only.

6   (#1-3, p. 40).  On January 29, 2005, plaintiff requested a copy of the IP 5.01 written memorandum

7   required when the full committee recommends removal from HRP status (#27-2, p. 28).  AWO

8   Endel responded "It will not be provided.  You can address with the courts."  *Id*.  Plaintiff's

9   February 7, 2005 OIS entry states "I/M has been advised his request for removal from HRP status

10  was denied" (#114, Ex. A, p. 12).

11          Plaintiff appeared before the full classification committee on January 20, 2006.  *Id*.  AWO

12  Endel requested that plaintiff be considered for removal, and stated that plaintiff would receive

13  another review in thirty days with defendant McDaniel present.  *Id*.  The February 17, 2006 entry

14  states:

15          I/M seen for HRP Rev.  Has been long term HRP due to his
        making keys at SDCC in past.  I/M asked why he needs to remain
16          HRP wants to be changed to Ad Seg status claims will allow him
        better chance at parole hearings.  *Was advised by Warden*
17          *McDaniel that he will **never** get removed from HRP*.

18  *Id*. (emphasis added).  Plaintiff's request was denied.  *Id*.  Plaintiff appeared before the full

19  committee on March 1, 2007, and the case notes state, "I/M requested removal from HRP status.

20  Denied by Warden McDaniel."  *Id*. at p. 13.

21          Pursuant to the first *Matthews* factor, plaintiff's liberties are clearly curtailed at the outset,

22  by the mere fact of being in jail, and his interest in avoiding erroneous placement in HRP is

23  viewed in that context.  Further, it is clear that the third factor – NDOC's interest in the safety and

24  security of its guards, other inmates, and the public at large – is a dominant consideration.  It is

25  the second *Matthews* factor – whether the procedures are sufficient to avoid erroneous placement

26  – which is at issue in this case.  At first glance, Nevada's procedures appear consistent with those

27  set out in *Greenholtz* and *Hewitt*.  HRP inmates must go through an initial classification process

28  prior to being classified HRP.  They are thereafter provided with monthly reviews at their cell

15

1  doors, and with bi-annual reviews before the full classification committee.  The policy requires

2  that inmates have the opportunity to be present at their review and present statements on their

3  behalf.  Inmates are to be provided twenty-four hour notice of each review.

4       However, the prison must follow the policy for it to be valid.  Based on the evidence

5  currently before this court, plaintiff received absolutely no notice or opportunity to be heard

6  before he was initially classified HRP (#134, Ex. 4).[10]  When plaintiff filed a grievance asking

7  why he never received an initial classification hearing either upon transfer to ESP or after

8  satisfying his disciplinary sanction in March 1999, prison officials ignored that issue and simply

9  told plaintiff that his status had been "addressed" (#134, Ex. 3).

10      Plaintiff alleges that many times he did not receive notice of his reviews.  It is not clear

11 from the evidence whether he received proper notice of his monthly and semi-annual reviews, or

12 if he did receive notice, how much.  It is clear that plaintiff did not attend some of his reviews

13 (#114, Ex. A).

14      Plaintiff also claims that he does not receive reasons for denial of his removal requests.

15 Aside from very cursory or irrelevant explanations, the evidence before this court indicates that

16 plaintiff has not been informed as to the specific basis of the decision not to remove the HRP

17 status.[11]  The Court in *Greenholtz* noted that such information was necessary "as a guide to the

18 inmate for his future behavior."  *Greenholtz*, 99 S.Ct. at 2108.  While plaintiff's OIS indicates

19 that plaintiff has been intermittently informed of the criteria for removal from HRP, this criteria

20 is not always applied as set in detail below.  The court imagines that it would be difficult for an

21 inmate to determine how to get an HRP classification removed unless the inmate was informed

22

23      [10] Defendant McDaniel denied that the classification committee failed to see plaintiff prior to his
     initial HRP classification (#98-2, RFA response 9).  However, the court has no evidence that plaintiff

24   received a hearing prior to being classified HRP.

25      [11] The little evidence the court has seen demonstrates that justifications are less than helpful in
     guiding plaintiff's future behavior.  *See* #34-11, p. 10 (reason for denial is "Other.  Your current status will

26   be reviewed for change at full committee 6-27-02."); *see also id.* at p. 11 (reason for denial is "Other.  In
     December 2002 you will meet part of the criteria.  You will remain in your current status at this time."); *see*

27   *also id.* at p. 12 (reason for denial is "Other.  Continue on HRP & remain disciplinary free."); *see also id.*
     at p. 13 (reason for denial is "Other.  HRP status.").  However, it is possible that plaintiff receives more detail

28   orally at his hearings.

1    directly by the final decision-maker how to do so.

2        This leads the court to its central concern, which is the fact that the Warden retains the

3    sole discretion in determining whether HRP status is removed. Even in the face of a unanimous

4    written recommendation from the full classification committee, the HRP policy allows the

5    Warden to deny removal of HRP status based on his own reasons and without documentation.

6    Defendant McDaniel has admitted that he does not view the IP 5.01 criteria for removal as

7    mandatory and that he may apply the criteria at his sole discretion (#103, Ex. 10, RFA response

8    92). For years, reviewers have informed plaintiff that remaining disciplinary-free was the only

9    way he would be considered for HRP removal – in fact, until recently, that was their main

10    justification for keeping him HRP. However, defendant McDaniel has admitted that some

11    inmates who failed to remain disciplinary free for an entire year were removed from HRP status,

12    as were some inmates classified HRP for less than one year (#103, Ex. 10, RFA responses 33 and

13    98). Notably, when plaintiff was able to remain disciplinary free for over two years, his status

14    was not changed.[12]

15        The ESP procedure permitting one individual sole discretion over HRP removal, which

16    discretion is based on criteria that can change at the individual's whim, leaves open the very real

17    possibility of abuse. In *Wilkinson*, the Court approved Ohio's new procedure whereby a three-

18    member classification committee holds a hearing for which the inmate receives forty-eight hours

19    notice and an opportunity to be heard. *Wilkinson*, 545 U.S. at 216. If the committee does not

20    recommend placement, the process terminates. *Id*. However, if placement is recommended, the

21    committee drafts a report setting forth the basis for its decision and sends it to the Warden where

22    the prisoner currently resides. *Id*. at 216-17. If the Warden disagrees, the process terminates. *Id*.

23    at 217. If the Warden agrees, he must document his reasons and forward the report to the Bureau

24    of Classification, a body of Ohio prison officials, for final decision. *Id*. The inmate has appeal

25    rights. *Id*. The process is the same for annual reviews. *Id*. Very significant to this court's

26

27      [12] The "Offense in Custody History" portion of plaintiff's OIS demonstrates that plaintiff was

28    disciplinary-free for over two years, from October 28, 2003 through February 17, 2006 (#114, Ex. A, pp. 1-2).

analysis is the *Wilkinson* court's implicit rejection of Ohio's previous policy. The Court noted:

> Although [pursuant to the new policy] a subsequent reviewer may overturn an affirmative recommendation for OSP placement, the reverse is not true; if one reviewer declines to recommend OSP placement, the process terminates. *This avoids one of the problems apparently present under the Old Policy, where, even if two levels of reviewers recommend against placement, a later reviewer could overturn their recommendation without explanation.*

*Id*. at 226 (emphasis added). The Court cited with approval the new policy's requirement that anyone recommending placement provide a short statement of reasons because such a requirement "guards against arbitrary decisionmaking while also providing the inmate with a basis for objection before the next decisionmaker or in a subsequent classification review" and "serves as a guide for future behavior." *Id*.

While ESP prison management must have some discretion to deal with different inmates with limited resources, the evidence indicates to this court that removal from HRP can be a moving target. For example, although another main reason plaintiff is still classified HRP is that the prison thinks he is an escape risk, defendant McDaniel has admitted that another inmate caught trying to escape from ESP was never designated to HRP (#36, RFA response 14). He further admitted that other ESP inmates have been caught with handcuff keys but were not classified to HRP (#27, RFA response 10). Defendant McDaniel has also conceded that he has removed other inmates from HRP status who have extensive disciplinary histories, violent histories, history of escape, hostage-taking situations, and who have committed rape and murder while incarcerated (#27, RFA responses 19 and 75). Additionally, he admitted that certain inmates who had assaulted staff and other inmates and who were criminally prosecuted for such were never classified HRP (#103, Ex. 10, RFA response 32).[13]

The Ninth Circuit has held that "an inmate's constitutional rights, ... may be violated by the arbitrary and selective enforcement" of otherwise sufficient prison policies. *Phillips v. Hust*, 477 F.3d 1070, 1077 (9th cir. 2007) (citing *Baumann v. Arizona Dept. Of Corrections*, 754 F.2d

---

[13] The evidence demonstrates that plaintiff has never been violent in prison, and has not been incarcerated for a violent crime.

841, 845 (9th Cir. 1985) (holding that selective enforcement of regulations can constitute a violation of an inmate's due process rights if it results in a deprivation of a prisoner's liberty interest)).  The court concludes that ESP's HRP policy as written, combined with how defendant McDaniel applies it, is inconsistent with due process.  The policy allows a sole individual to make an undocumented decision rejecting a full committee's unanimous written recommendation to remove an inmate from HRP status.  This is the exact evil the *Wilkinson* Court implicitly rejected. The prison can then – and did, in plaintiff's case – deny the prisoner access to the full committee report.  Very significantly, for that sole decisionmaker to state that an inmate will "never" be removed from HRP does not imply to this court that the criteria are applied impartially based on re-evaluation of the circumstances at each review.  Moreover, defendant McDaniel does not find that applying the criteria in the policy is mandatory.  As the situation now stands, plaintiff could remain disciplinary-free forever, be cooperative, participate in programming, and acknowledge responsibility for his past disciplinary violations, and still "never" be removed from HRP.[14]

The court concludes that allowing one individual the discretion to determine HRP status, based on what the evidence demonstrates are – at times – arbitrary considerations, does not comport with due process.  Whether plaintiff has received due process is an issue of fact for trial.

### 3. Eighth Amendment Conditions of Confinement Claim

Defendants next argue that plaintiff has failed to prove that he has sustained an injury from his time in HRP segregation (#114).  Plaintiff claims that he suffers from severe headaches once a week, that the leg restraints cut into his legs, and that he frequently awakens with a bloody

---

[14] It is interesting that plaintiff's caseworker stated in plaintiff's parole board report in 2001 and 2004 that plaintiff "has a moderate disciplinary history," "relates appropriately to other inmates and staff," "is cooperative," and that his disciplinary violations were decreasing in "frequency" and "severity" (#103, Ex. 7 and Ex. 8).  In 2001, the caseworker additionally stated that plaintiff "is a positive influence" and "has adjusted well."  *Id.* at Ex. 7.

However, the court does acknowledge plaintiff's lengthy disciplinary history.  It is also aware that some of plaintiff's disciplinary violations relate to possessing keys, tampering with locks, and removing restraints.  Incredibly, plaintiff sought to demonstrate to defense counsel during plaintiff's deposition how he could remove his handcuffs using a paperclip "key" (#114, Ex. D, pp. 26-28).  Plaintiff proclaims his innocence, but appears to get in his own way much of the time.  In this order, the court simply addresses whether the procedures at ESP for HRP removal pass constitutional muster.  It may be that plaintiff will remain classified HRP even under constitutionally sufficient due process procedures.

1    nose (#134).

2          An inmate may challenge the conditions of his confinement as a violation of his Eighth

3    Amendment right to be free from cruel and unusual punishment if he satisfies objective and

4    subjective standards. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000); *see also Estelle v.*

5    *Gamble*, 429 U.S. 97, 102 (1976).  The objective standard requires prison officials to provide

6    inmates with adequate shelter, food, clothing, sanitation, medical care, and personal safety.

7    *Johnson*, 217 F.3d at 731.  A claim may arise if the conditions of confinement cause a sufficiently

8    serious deprivation.  *Id*.  The court must evaluate the circumstances, nature and duration of the

9    deprivation to determine whether it is inhumane or so egregious that it could result in significant

10   injury or unnecessary and wanton infliction of pain.  *Id*.

11         The subjective standard requires a showing that prison officials were deliberately

12   indifferent to the inmate's safety.  *Id*.  Prison officials must be aware of the facts that present a

13   substantial risk of harm to the inmate, and recognize that the situation poses a substantial risk of

14   harm.  *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049-50 (9th Cir. 2002).  Mere

15   negligence does not prove deliberate indifference.  *Hutchinson v. United States*, 838 F.2d 390,

16   394 (9th Cir. 1988).

17         The court concludes that there is no evidence that plaintiff has incurred a serious

18   deprivation as a result of his confinement in HRP segregation.  Although the court acknowledges

19   that such severe confinement over a period of ten years has the potential to mentally injure an

20   inmate, there is simply no evidence of it in this case.  Plaintiff submits no medical records to

21   support his claims of headaches, leg restraint injuries, and bloody noses.  Additionally, he does

22   not submit any records to demonstrate that he suffers from a mental illness caused by the

23   conditions of his confinement.  There is no allegation that plaintiff has been deprived of shelter,

24   food, clothing, sanitation, medical care, or personal safety.  The court grants defendants' motion

25   to dismiss plaintiff's Eighth Amendment claim.

26                          **4. First Amendment Retaliation Claim**

27         Defendants contend that plaintiff has no evidence and "nothing but his own beliefs" to

28   support his allegations of retaliation (#114).  They further argue that plaintiff has failed to allege

1   that his speech has been "chilled" or that defendants have not advanced legitimate penological

2   goals in confining plaintiff to HRP.  *Id*.  Defendants note that plaintiff files many grievances in

3   prison, that he has a pending habeas action in state court, and that he adequately prosecutes this

4   lawsuit.  *Id*.  Plaintiff claims that when he refused to cooperate with SDCC officers investigating

5   the key incident in 1998, they retaliated against him by sending him to ESP and making sure that

6   he was classified HRP (#134).  Plaintiff claims that the retaliation continues to this day, with

7   prison officials issuing false NOCs to keep him on HRP status.  *Id*.

8          Prisoners have a right to meaningful access to the courts, and prison authorities may not

9   penalize or retaliate against an inmate for exercising this right.  *Bradley v. Hall*, 64 F.3d 1276,

10  1279 (9th Cir. 1995).  A retaliation claim involves five elements: "(1) An assertion that a state

11  actor took some adverse action against an inmate (2) because of (3) that prisoner's protected

12  conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and

13  (5) the action did not advance a legitimate correctional goal."  *Rhodes v. Robinson*, 213 F.3d 443,

14  449 (9th Cir. 2000), and *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curium).

15  Such claims must be evaluated in light of the deference accorded to prison officials.  *Pratt v.*

16  *Rowland*, 65 F.3d 802, 807 (9th Cir. 1997).  The inmate bears the burden of pleading and proving

17  the absence of legitimate correctional goals for the alleged retaliatory action.  *Id*. at 806.  The

18  Ninth Circuit has recognized that "timing can properly be considered as circumstantial evidence

19  of retaliatory intent."  *Id*. at 808.

20         As evidence of the alleged retaliation, plaintiff points to his June 17, 1998 NDOC

21  "Transfer Chrono" which is not signed by the transfer coordinator, and which he argues

22  incorrectly states that he "voluntarily" chose transfer to ESP (#134 (citing #126, Ex. 9)).  Plaintiff

23  claims that because he will not admit that he "manufactured" keys at SDCC, ESP officials harass

24  him by searching his cell more often than other inmates' cells and by issuing false NOCs.  *Id*.

25  Plaintiff claims this behavior began after he began to write kites to try to get removed from HRP

26  status.  *Id*.  Plaintiff also argues that at certain of his disciplinary hearings, the hearing officer will

27  not show him evidence of his alleged violations.

28         Viewing the evidence in the light most favorable to plaintiff, the court concludes that there

1   are no material issues of fact precluding summary judgment on plaintiff's retaliation claim.  Other

2   than his own contentions, plaintiff provides no admissible evidence to demonstrate defendants'

3   retaliatory intent.  Plaintiff presents no evidence to support his contentions that prison officials

4   plant paperclips and envelope clasps in his cell or lie about plaintiff tampering with locks.  In fact,

5   there is no evidence before the court refuting any of plaintiff's NOCs.  A party may not rest on

6   mere allegations or denials in the pleadings.  *Anderson*, 477 U.S. at 248.  Further, the evidence

7   indicates that plaintiff has been able to file numerous kites over the years challenging his HRP

8   status, as well as the current federal lawsuit in which there a sizable number of docket entries,

9   many filed by the plaintiff.  As plaintiff has not presented evidence sufficient to establish the

10  existence of a factual disagreement regarding whether his rights have been chilled or whether

11  defendants have acted with retaliatory animus, the court grants defendants' motion as to

12  plaintiff's retaliation claim.

13          **5. Qualified Immunity**

14          Finally, defendants argue they are entitled to qualified immunity.  The defense of qualified

15  immunity protects state officials sued in their individual capacities unless the conduct complained

16  of violates a clearly established constitutional or statutory right of which a reasonable person

17  would have known.  *Jackson v. City of Bremerton*, 268 F.3d 646, 650 (9th Cir. 2001).  A qualified

18  immunity analysis begins with a threshold question of whether, based upon facts taken in the light

19  most favorable to the party asserting the injury and in light of such clearly established law, an

20  official's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If

21  no constitutional right was violated, the court need not inquire further.  *Id*.  However, if a

22  constitutional violation occurred, the court's second inquiry is whether the official could

23  nevertheless have reasonably, but mistakenly, believed that his or her conduct did not violate a

24  clearly established constitutional right.  *Id*.  Qualified immunity protects "all but the plainly

25  incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 355, 341

26  (1986).

27          Defendants assert that they are entitled to qualified immunity because plaintiff has no

28  liberty interest in his classification, and even assuming he does, he received due process and

procedural protections (#114, p. 16).[15]  Defendants make no specific argument with respect to plaintiff's due process claim such as whether the law was clearly established or why they reasonably believe that their conduct is lawful.  Thus, defendants have failed their burden of putting forth facts and evidence to demonstrate the absence of any genuine issues of material dispute.  Accordingly, the court denies defendants's request for summary judgment on grounds of qualified immunity.

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that:

1. Plaintiff cannot sue defendants in their official capacities for money damages;

2. Plaintiff has a state-created liberty interest in remaining free from HRP classification;

3. The procedure allowing one individual sole discretion over removal of an inmate from HRP status, as written and as applied by defendant McDaniel, is arbitrary and unconstitutional;

4. There is an issue of fact as to whether plaintiff received sufficient due process in his initial classification and thereafter;

5. Plaintiff has not submitted evidence demonstrating there exists a genuine issue of material fact that he has been injured by his HRP classification; therefore, plaintiff's Eighth Amendment rights have not been violated;

6. Plaintiff has not submitted evidence demonstrating there exists a genuine issue of material fact that defendants' actions have chilled plaintiff's exercise of his First Amendment rights, or that defendants acted with retaliatory intent; therefore, plaintiff's First Amendment rights have not been violated; and

7. Defendants failed to meet their burden of putting forth facts and evidence to demonstrate the absence of any material facts with respect to their request for qualified immunity.

The court recommends that defendants' motion for summary judgment (#114) be **GRANTED** as to plaintiff's claims against defendants in their official capacities for money damages, his Eighth Amendment conditions of confinement claim, and his First Amendment retaliation claim and be **DENIED** as to plaintiff's Fourteenth Amendment due process claim and defendants' request for qualified immunity.

---

[15] The court need not address plaintiff's conditions of confinement and retaliation claims as it has already concluded they should be dismissed.

The parties are advised:

1.   Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within ten days of receipt.  These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.   This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment (#114) be **GRANTED** as to plaintiff's claims against defendants in their official capacities for money damages, his Eighth Amendment conditions of confinement claim, and his First Amendment retaliation claim and be **DENIED** as to plaintiff's Fourteenth Amendment due process claim and defendants' request for qualified immunity.

**DATED:** August 20, 2008.

_Valerie P. Cooke_

_____

**UNITED STATES MAGISTRATE JUDGE**

24